**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
                                             :              PENNSYLVANIA
                                             :
                  v.                          :
                                           :
BOBBY BROWN                     :
                                         :
              Appellant      :     No. 3469 EDA 2018

Appeal from the Judgment of Sentence Entered August 13, 2018
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0000043-2017

BEFORE:  PANELLA, P.J., OLSON, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:         **FILED NOVEMBER 27, 2019**

Appellant Bobby Brown appeals from the judgment of sentence imposed after a jury convicted him of attempted murder–causing serious bodily injury, aggravated assault–causing serious bodily injury, aggravated assault with a deadly weapon, firearms not to be carried without a license (VUFA), simple assault, simple assault with a deadly weapon, and recklessly endangering another person (REAP).[1]  On appeal, Appellant challenges the trial court's denial of his suppression motion, the sufficiency of the identification evidence supporting his convictions, and the discretionary aspects of his sentence.  We affirm.

The trial court summarized the underlying facts of this matter as follows:

---

[1] 18 Pa.C.S. §§ 901(a), 2502(a), 2702(a)(1), 2702(a)(4), 6106(a)(1), 2701(a)(1), 2701(a)(2), and 2705, respectively.

On November 1, 2016, Robert Pfanders [(the complainant)] was working in a garage at 47 King Street in Pottstown with Terry Presgrave [(Presgrave)] when [Appellant] arrived looking for his motorcycle between 2:00 p.m. and 2:15 p.m. [Appellant] was a friend of [the complainant] and had asked [the complainant] to do some repair work on one of his motorcycles. [Appellant] believed that one of the motorcycles he saw in the garage that day belonged to him. [The complainant] told [Appellant] he was mistaken and that his motorcycle was not in the garage. [Appellant] began arguing with [the complainant] and the argument culminated in [Appellant] shooting [the complainant] in his back. The first bullet entered [the complainant] below his left shoulder blade. [The complainant] turned around and starting cursing at [Appellant]. [Appellant] then shot him again. [The complainant] fell to the ground and [Appellant] shot him a third time while he was on the floor. [Appellant] fired one or two errant shots in the direction of Presgrave before fleeing the garage.

Presgrave testified he was working at the mechanic's garage at 47 King Street with [the complainant] on November 1, 2016 when [Appellant] came into the garage looking for someone named "J.R." [Appellant] was informed no one named J.R. was at this garage and that he might check a nearby garage on the same block. [Appellant] left and then returned to the garage at 47 King Street a short time later. [Appellant] and [the complainant] then began talking. [Appellant] believed a motorcycle in the garage belonged to him. [The complainant] and [Appellant] began to argue about the motorcycle. At some point during the argument, Presgrave observed [Appellant] in possession of a firearm. Presgrave heard a bang as he turned to get a cigarette. He turned and saw [the complainant] falling to the ground.

Presgrave dialed 9-1-1 and reported the shooting. Presgrave initially fled, but quickly returned to aid [the complainant]. [The complainant], believing he was about to die, told Presgrave the shooter's name was Bobby Brown [(later identified as Appellant)]. He further stated that Bobby Brown was from Norristown and was between thirty-eight and forty years old. While in the ambulance, [the complainant] told Detective [Mark] Wickersham that it was [Appellant] who shot him. Both Presgrave and [the complainant] later selected [Appellant] from separate photo array line-ups as the person who shot [the complainant].

Timothy Santiago [(Santiago)] was in a nearby mechanic's shop having his car worked on when the shooting occurred. Santiago

- 2 -

heard gunshots and then saw two men running out of the alley behind the 47 King Street garage. The two men jumped in an older looking green vehicle that appeared to be a Jeep, which quickly drove away.

On November 1, 2016, at approximately 2:40 p.m., Officer Corey Pfister of the Pottstown Police Department was dispatched to the scene of a shooting at 47 King Street in the Borough of Pottstown. Upon arriving on the scene, Officer Pfister observed an open garage and a shooting victim lying on the ground. Officer Pfister interviewed Presgrave while another officer began rendering aid to the victim. Presgrave told [O]fficer Pfister that [the complainant] had been shot multiple times and that the shooter, Bobby Brown, was no longer at the scene. Presgrave was then transported back to the police station to be further interviewed. Officer Jacob Ritter, the officer rendering aid to [the complainant], discovered a nine-millimeter shell casing while conducting a search of the garage.

The testimony of Dr. Ian Hood, a forensic pathologist, confirmed that [the complainant] was shot three times. [The complainant] was shot in the back two or three inches below the bottom of his left shoulder blade. That bullet pierced his lung and colon, lacerated his spleen and remained in his body. That bullet traveled through the diaphragm and the descending colon causing contamination of the "normally sterile peritoneum." [The complainant] suffered a hemopneumothorax. [The complainant's] spleen and a portion of his colon had to be surgically removed. He required a specialized [vacuum assisted closure] (V.A.C.) dressing to keep his abdomen closed to avoid sepsis. Another bullet went through his left forearm. A third bullet went through his left thigh and shattered his femur. [The complainant] lost approximately twenty percent of his blood volume and was at high risk of death from blood loss, sepsis, and other complications. [The complainant] was taken to Lehigh Valley Hospital and intubated for six days. [The complainant] was discharged to a rehabilitation facility after twelve days in the hospital.

Detective Brook Fisher of the Pottstown Police Department participated in the investigation of the crime scene. Detective Fisher recovered two nine-millimeter shell casings on the floor of the 47 King Street garage. Detective Fisher also obtained a latent fingerprint from the exterior of a vehicle in the garage on the day of the shooting, which was sent to the Pennsylvania State Police

for testing. Trooper Jeffrey Custer, working for the Pennsylvania State Police at the Bethlehem Regional Laboratory, performed an analysis of the latent fingerprint and concluded that it matched [Appellant].

On November 4, 2016, Detective Heather Long encountered [Appellant's] girlfriend driving a green Jeep Grand Cherokee near the 47 King Street garage. Detective Long identified this vehicle as the same one seen speeding away from the 47 King Street garage the day of the shooting in a surveillance video obtained from Yohn's Grocery store. It also matched the description of the vehicle seen speeding away from the garage on that day provided by witness Santiago.

Dan Drumheller, a manager at Bridgeport Auto near the 47 King Street garage, testified that [Appellant] sometimes drove a green Jeep. Drumheller knew [the complainant] and stated that [Appellant] told him shortly before the day of the shooting that he was looking for [the complainant] because he "ripped him off for a motorcycle and some money" and that he was going to "F him up."

Detective Corporal Thomas Leahan of the Pottstown Police Department testified that state police records confirmed [Appellant] did not have a license to carry a firearm on November 1, 2016.

On November 25, 2016, Officer Kevin Gorman of the Philadelphia Police Department pulled [Appellant] over to make a routine traffic stop. [Appellant] initially provided a false name, identifying himself as Maurice Brown. When Officer Gorman eventually determined that the driver's actual name was Bobby Brown, he took him into custody under an active warrant out of Pottstown for attempted homicide.

Trial Ct. Op., 3/8/19, at 2-6.

Thereafter, the Commonwealth filed an information charging Appellant with offenses related to the shooting. On August 3, 2017, Appellant filed a motion to suppress the identification evidence. Appellant argued that the "photo array lineup was prejudicial and unduly suggestive" because none of

the other photographs resembled Appellant. **See** Omnibus Pre-Trial Mot., 8/3/17, at 2. Following a suppression hearing on April 2, 2018, the trial court denied Appellant's motion.

On May 21, 2018, following three days of testimony, the jury returned a guilty verdict on each of the foregoing crimes. **See** N.T. Jury Trial, 5/21/18 at 103-04. After finding Appellant guilty of attempted murder, the jury also answered "yes" to the verdict interrogatory on serious bodily injury related to the attempted murder. **Id.** at 103. Sentencing was deferred for preparation of a pre-sentence investigation (PSI) report.

On August 13, 2018, the trial court held a sentencing hearing. The trial court noted that the Commonwealth proved, and the jury found, that Appellant inflicted serious bodily injury on the complainant. **See** N.T. Sentencing Hr'g, 8/13/18, at 39. The trial court heard testimony from Appellant, Appellant's family, and the complainant. **Id.** at 5-39. Ultimately, the trial court sentenced Appellant to a term of twenty to forty years' incarceration for attempted murder[2] and a consecutive term of two-and-a-half

---

[2] Briefly, we note that the statutory maximum sentence for attempted murder resulting in serious bodily injury is forty years' incarceration. **See** 18 Pa.C.S. § 1102(c). However, "[s]erious bodily injury is a fact that must be proven" before the trial court can impose the maximum sentence. **Commonwealth v. Barnes**, 167 A.3d 110, 117 (Pa. Super. 2017) (*en banc*). The Commonwealth must also provide notice to the defendant that it seeks to prove serious bodily injury prior to trial. **See id.** Here, the Commonwealth included the element of serious bodily injury in the criminal information, and the trial court reiterated Appellant's sentencing exposure during a pre-trial colloquy. **See** N.T. Jury Trial, 5/17/18 at 4-7. The trial court also instructed

to five years' incarceration for VUFA. *Id.* at 40-42. The court imposed no further penalty for the remaining convictions.

On August 15, 2018 and August 21, 2018, the trial court docketed several *pro se* filings by Appellant, which included a motion to modify his sentence, a motion for judgment of acquittal, a motion to vacate his sentence, and a motion for a new trial. On August 23, 2018, Appellant's trial counsel filed a motion to withdraw from representation along with a timely post-sentence motion preserving Appellant's *pro se* claims.[3]

On October 19, 2018, the trial court held a motions hearing. First, the trial court addressed trial counsel's motion to withdraw. *See* N.T. Mot. Hr'g, 10/19/18, at 3-4. Appellant claimed that trial counsel was ineffective, and requested that the trial court appoint new counsel for purposes of his appeal. *Id.* The trial court indicated that it would grant counsel's motion to withdraw and appoint new counsel after trial counsel filed a notice of appeal and Pa.R.A.P. 1925(b) statement to preserve Appellant's rights. *Id.* at 5. Trial

_____

the jury on the element of serious bodily injury relating to attempted murder, and the jury made a factual finding. *See* N.T. Jury Trial, 5/21/18, at 75. Therefore, the trial court was authorized to impose the maximum sentence of forty years' incarceration. *See* 18 Pa.C.S. § 1102(c); *see also Barnes*, 167 A.3d at 117.

[3] In pertinent part, the counseled post-sentence motion argued that (1) the court abused its discretion by imposing a sentence that was unreasonable and excessive under the circumstances of the case; and (2) the court did not adequately consider Appellant's age, family history, education, employment history, and mental health. *See* Post-Sentence Mot., 8/23/18, at 2.

counsel also argued in support of Appellant's *pro se* post-sentence motions, which the trial court ultimately denied on November 5, 2018.

Appellant, through trial counsel, filed a timely notice of appeal on November 30, 2018, and subsequently complied with the trial court's order for a Pa.R.A.P. 1925(b) statement.[4]  On December 17, 2018, trial counsel filed a motion to appoint private conflict counsel on appeal.  The trial court appointed new counsel to represent Appellant[5] and issued a Rule 1925(a) opinion disposing of Appellant's claims.

Appellant now raises three issues, which we have reordered as follows:

1. Whether the trial court erred and committed an abuse of discretion by denying Appellant's motion to suppress the photo array lineup as unduly suggestive.

2. Whether there was insufficient evidence to prove beyond a reasonable doubt that Appellant was guilty of attempted murder, aggravated assault, and [VUFA].

3. Whether an aggregate sentence of twenty-two and a half (22 ½) to forty-five (45) years' incarceration was manifestly excessive and clearly unreasonable.

Appellant's Brief at 6 (some formatting altered).

---

[4] Appellant's Rule 1925(b) statement contained the same issues that Appellant now raises in his brief.

[5] The docket reflects that the trial court originally appointed new counsel on March 12, 2019.  However, on March 25, 2019, the trial court vacated its previous order and appointed current counsel, Attorney Erin C. Lentz-McMahon, Esq.

In his first issue, Appellant argues that the trial court erred by denying his motion to suppress. ***Id.*** at 35. By way of background, the trial court summarized the testimony presented at the suppression hearing as follows:

Detective Wickersham testified he interviewed Presgrave, a potential witness in the case, as part of the investigation. Presgrave had provided a description of the shooter. Presgrave stated that he did not know the shooter prior to the shooting. Using demographic information from Presgrave's description, Detective Wickersham's administrative assistant used the Commonwealth Photo Imaging Network (CPIN) and the Justice Network (JNET) to generate a photo array line-up of individuals whose appearances were similar to Appellant's. Generally, these databases create an array of approximately thirty images similar in appearance to a defendant, which are then further narrowed to the eight most similar images. The photo array is intentionally presented by someone other than the person who generated it. Presgrave read and signed instructions explaining how the line-up is administered, including the possibility that the suspect may not be in the line-up,[6] and how he would be shown all eight photographs no matter when or if he made an identification. On November 1, 2016, the day of the shooting, a photo array was shown to Presgrave and he identified the seventh of eight images as the photograph of the shooter. The seventh image was a photograph of [Appellant].

Detective Corporal Leahan [testified that on November 7, 2016, he] administered the same photo array line-up using the same methodology to [the complainant]. The only difference between the line-up shown to [the complainant] and the one shown to Presgrave was that Presgrave's was in color and [the complainant's] was in black and white. [The complainant] identified the seventh image as being a photograph of the shooter and stated that the name of the person in the photograph was Bobby Brown. [The complainant] knew [Appellant] prior to the

_____

[6] The instructions also indicate that "the person in the photograph may or may not appear as they did at the time of the crime." N.T. Suppression Hr'g, 4/2/18, at 11.

shooting.   Although [the complainant] was in the hospital recovering from his wounds[7] when the photo array line-up was administered, he appeared "very alert and sharp."

Trial Ct. Op. at 9-10.

On appeal, Appellant raises the same arguments that he raised at the suppression hearing.  First, Appellant argues that his photo stood out from the others in the line-up because he was the only person smiling, his photo had a blue background, and the word "JNET" was printed at the bottom of his photo. Appellant's Brief at 36.   Second, he claims that because both witnesses selected the seventh photo from the same photo array approximately one week apart, there is a possibility that the two witnesses coordinated with one another before the complainant identified Appellant.  *Id.*   Third, he asserts that although Presgrave described the shooter as having a "goatee," none of the individuals in the photo array had this type of facial hair.  *Id.*   Therefore, Appellant contends that the police created the array "based upon the notion that the shooter was [Appellant]." *Id.* at 37.

We apply the following standard when reviewing the denial of a suppression motion:

> [An appellate court's] standard of review in addressing a
> challenge to the denial of a suppression motion is limited to

---

[7] Detective Leahan explained that he wanted to speak with the complainant at the hospital prior to November 7, 2016, but the complainant was unable to speak "because of the tube down his throat."  **See** N.T. Suppression Hr'g, 4/2/18, at 22, 29.  After the complainant's tube was removed on November 6, 2016, he asked to speak with detectives.  *Id.* at 29.  The following day, on November 7, 2016, Detective Leahan visited the complainant in the hospital to show him the photo array.  *Id.*

determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [ ] plenary review.

*Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa. Super. 2017) (citation omitted).

"In reviewing the propriety of identification evidence, the central inquiry is whether, under the totality of the circumstances, the identification was reliable." *Commonwealth v. Milburn*, 191 A.3d 891, 899 (Pa. Super. 2018) (citation omitted). "A photographic identification is unduly suggestive when the procedure creates a substantial likelihood of misidentification." *Commonwealth v. Crork*, 966 A.2d 585, 589 (Pa. Super. 2009) (citations and quotation marks omitted). "To establish reliability in the wake of a suggestive identification, the Commonwealth must prove, through clear and convincing evidence, the existence of an independent basis for the identification." *Commonwealth v. Davis*, 17 A.3d 390, 394 (Pa. Super. 2011).

In deciding whether to admit contested identification evidence, the trial court must consider: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of his prior description of the perpetrator at the confrontation; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and confrontation. Suggestiveness in the identification process is but one factor to be considered in determining the admissibility of such evidence and will not warrant exclusion absent other factors.

*Milburn*, 191 A.3d at 899-900 (citations and quotation marks omitted).

Here, at the suppression hearing, the trial court explained that it reviewed the photographs "very carefully," but it did not believe the photo array was "impermissibly suggestive" or gave rise to a "substantial likelihood of irreparable misidentification." N.T. Suppression Hr'g, 4/2/18, at 43. The trial court also noted that there was no evidence that "the two witnesses even spoke about the lineup array photographs or, if so, whether one [of the witnesses] communicated which [photo] was selected." *Id.*

Thereafter, in its Rule 1925(a) opinion, the trial court reiterated its analysis as follows:

An evaluation of the pertinent criteria in the instant case demonstrates that the identification procedure did not create a substantial likelihood of misidentification. Both [the complainant], who was previously familiar with [Appellant], and Presgrave had ample opportunity to view [Appellant] at the time of the shooting. Their degree of attention, prior description of [Appellant] before the photo array line-up and level of certainty were consistent. Presgrave identified [Appellant] the same day as the crime. The other people in the photos depicted exhibited similar facial features to those of [Appellant] and [Appellant's] photo did not stand out in any obvious way. There was no evidence that the witnesses' attention faltered, that the prior description by Presgrave was inaccurate or that either witness was uncertain in their identification of [Appellant]. The line-up was administered

- 11 -

by someone who had not created it and the witnesses were unaware if [Appellant] or any suspect was included among the eight images. There was no evidence of suggestivity in the administration of the photo array. Accordingly, the [trial] court's denial of [Appellant's] motion to suppress the identifications should be affirmed.

Trial Ct. Op. at 11.

Although Appellant argues that the photo array was unduly suggestive, he failed to ensure that the certified record contained a copy of the photo array in question. Therefore, we could find his claim waived. *See Commonwealth v. Manley*, 985 A.2d 256, 263-64 (Pa. Super. 2009) (stating that "[b]ecause we have not been furnished with a copy of the photo array in question in the record, the issue challenging suppression of the photo array is deemed waived). However, we affirm on the trial court's conclusion that there was independent support for the identification. *See Davis*, 17 A.3d at 394. Specifically, the trial court referred to the witnesses' opportunity to view the perpetrator, the level of certainty demonstrated at the time of the confrontation, the time between the crime and confrontation, and the fact that the complainant was familiar with Appellant prior to the shooting. *See Milburn*, 191 A.3d at 899. We discern no error in the trial court's factual determinations or legal conclusions in this regard. *See Smith*, 164 A.3d at 1257. Therefore, the trial court properly denied Appellant's suppression motion.

In his next claim, Appellant challenges the sufficiency of the identification evidence supporting his convictions for attempted murder,

aggravated assault, and VUFA.[8]  Appellant's Brief at 35.  Appellant asserts

that there was no DNA or fingerprint evidence "collected from the gun shells,

and no firearm was ever recovered by law enforcement."  *Id.* at 34.  He also

contends that there was no "license plate and/or positive identification" to

establish that Appellant was the individual who fled from the scene of the

crime.  *Id.*  Although Appellant acknowledges that the police found his

fingerprint on a car that was in the complainant's garage, he claims that there

was no evidence to establish that the fingerprint was from the day of the

shooting.  *Id.*  Appellant also asserts that "the Commonwealth's case relied

upon the identification made by [the complainant and Presgrave], both of

whom were under the influence of methamphetamine" at the time of the

shooting.  *Id.* at 33.

> We apply the following standard when reviewing a sufficiency claim:
>
> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary.  In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all

---

[8] The Commonwealth asserts that Appellant waived his sufficiency challenge because he failed to identify the precise element or elements at issue in his Rule 1925(b) statement.  Commonwealth's Brief at 11.  Appellant acknowledges that his Rule 1925(b) statement was deficient, but notes that he used an identification defense at trial, and the trial court identified and addressed his claim.  Appellant's Brief at 30.  It is well settled that a vague challenge to the sufficiency of the evidence may result in waiver.  ***See Commonwealth v. Roche***, 153 A.3d 1063, 1072 (Pa. Super. 2017).  Here, however, the trial court addressed Appellant's sufficiency claim in its Rule 1925(a) opinion.  Further, Appellant's theory of the case is ascertainable from the record.  Therefore, we decline to find waiver.  ***See Commonwealth v. Laboy***, 936 A.2d 1058, 1060 (Pa. 2007).

reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the factfinder.

**Commonwealth v. Palmer**, 192 A.3d 85, 89 (Pa. Super. 2018) (citation omitted).

"Criminal attempt to murder is defined by reading the attempt statute, 18 Pa.C.S. § 901(a), in conjunction with the [first-degree] murder statute, 18 Pa.C.S. § 2502(a)." **Commonwealth v. Predmore**, 199 A.3d 925, 929 (Pa. Super. 2018) (*en banc*). Therefore, to sustain a conviction for attempted murder, the Commonwealth must prove that "the defendant had the specific intent to kill and took a substantial step towards that goal." **Id.**

A person is guilty of aggravated assault if he:

(1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;

\*     \*     \*

(4) attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon[.]

18 Pa.C.S. § 2702(a)(1), (4).

- 14 -

As to VUFA, "any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree." 18 Pa.C.S. § 6106(a)(1).

"In addition to proving the statutory elements of the crimes charged beyond a reasonable doubt, the Commonwealth must also establish the identity of the defendant as the perpetrator of the crimes." *Commonwealth v. Smyser*, 195 A.3d 912, 915 (Pa. Super. 2018) (citation omitted).

> [E]vidence of identification need not be positive and certain to sustain a conviction. Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be used as other circumstances to establish the identity of a perpetrator. Out-of-court identifications are relevant to our review of sufficiency of the evidence claims, particularly when they are given without hesitation shortly after the crime while memories were fresh. Given additional evidentiary circumstances, any indefiniteness and uncertainty in the identification testimony goes to its weight.

*Commonwealth v. Orr*, 38 A.3d 868, 874 (Pa. Super. 2011) (*en banc*) (citations and quotation marks omitted).

Here, Appellant's claim relates solely to the sufficiency of the Commonwealth's identification evidence. Accordingly, we limit our discussion to the evidence for that element. *See Commonwealth v. Cain*, 906 A.2d 1242, 1244 (Pa. Super. 2006) (declining to address the sufficiency of the evidence supporting every element of an offense where the appellant raises a claim relating to one specific element).

In its Rule 1925(a) opinion, the trial court noted that "[b]oth [the complainant] and Presgrave, eyewitnesses to the event, testified that the shooter was [Appellant]." Trial Ct. Op. at 7. Additionally, Santiago testified that he "heard gunshots before he saw a green Jeep fleeing the 47 King Street garage." *Id.* at 8. The trial court explained that

> [t]his Jeep was later identified as one that was regularly driven by [Appellant] and seen in the possession of [Appellant]'s girlfriend. [Appellant]'s fingerprint was found on a vehicle that was in the 47 King Street garage on the day of the shooting. Both [the complainant] and Presgrave picked [Appellant] out of separate photo array line-ups as the perpetrator. There was testimony from a nearby store manager, Drumheller, that [Appellant] had been looking for [the complainant] and had made threats against [the complainant] before the shooting. Finally, [Appellant] gave a false name to law enforcement when he was first apprehended.

*Id.* at 7.

Our review of the record confirms that, when viewed in the light most favorable to the Commonwealth as verdict winner, the evidence was sufficient to identify Appellant as the shooter. *See Palmer*, 192 A.3d at 89. Both Presgrave and the complainant identified Appellant in an out-of-court photo array and at trial. *See Orr*, 38 A.3d at 874. Further, the Commonwealth presented circumstantial evidence sufficient to establish Appellant's guilt. *See Palmer*, 192 A.3d at 89. Therefore, Appellant's sufficiency claim fails.

To the extent Appellant challenges the reliability of the witnesses' identifications, this relates to the weight of the evidence. *See Commonwealth v. Griffin*, 65 A.3d 932, 939 (Pa. Super. 2013) (stating that an argument as to the "credibility of the Commonwealth's chief witness" is a

challenge to the weight, not the sufficiency, of the evidence); *see also Commonwealth v. Davis*, 799 A.2d 860, 864 (Pa. Super. 2002) (reiterating that weight and sufficiency claims "are discrete inquiries"). Because Appellant did not preserve a weight claim in his Rule 1925(b) statement, it is waived. *See* Pa.R.A.P. 1925(b)(4)(ii) (stating that issues not included in the Rule 1925(b) statement are waived).

In his final issue, Appellant challenges the discretionary aspects of his sentence. Appellant's Brief at 36. He asserts that the sentence was "manifestly excessive and clearly unreasonable" because the trial court did not properly consider mitigating factors. *Id.* Specifically, Appellant states that he "suffers from mild retardation" as well as "mental illness that has required several inpatient hospitalizations." *Id.* at 39. Further, Appellant asserts that he "did not have a reputation in the community for being a violent person," "his prior criminal history only consisted of misdemeanors," and he "has strong family support." *Id.* at 40. Appellant also argues that he "[h]e clearly expressed anger over [the complainant] never returning his motorcycle" and "under these circumstances, [Appellant] had a right to be upset with [the complainant]." *Id.*

"[C]hallenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right." *Commonwealth v. Derry*, 150 A.3d 987, 991 (Pa. Super. 2016) (citation omitted). Rather, before reaching the merits of such claims, we must determine: "(1) whether the appeal is timely; (2) whether [the a]ppellant preserved his issues; (3) whether [the a]ppellant's

brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question." ***Commonwealth v. Corley***, 31 A.3d 293, 296 (Pa. Super. 2011) (citation omitted).

Here, Appellant timely filed a notice of appeal, preserved his claim in a post-sentence motion, and included a concise statement of reasons relied upon for allowance of appeal in his brief. ***See id.*** Additionally, Appellant's claim that the trial court imposed an excessive sentence because it failed to consider mitigating factors raises a substantial question. ***See Commonwealth v. Zeigler***, 112 A.3d 656, 662 (Pa. Super. 2015) (stating that "an excessiveness claim in conjunction with an assertion that the court did not adequately consider a mitigating factor may present a substantial question" (citation omitted)). Therefore, we will review Appellant's claim.

Our well-settled standard of review is as follows:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgments for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Raven***, 97 A.3d 1244, 1253 (Pa. Super. 2014) (citation omitted).

When imposing a sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant. In particular, the court should refer to the defendant's

prior criminal record, his age, personal characteristics and his potential for rehabilitation. Where the sentencing court had the benefit of a [PSI], we can assume the sentencing court was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors. Further, where a sentence is within the standard range of the guidelines, Pennsylvania law views the sentence as appropriate under the Sentencing Code.

*Commonwealth v. Moury*, 992 A.2d 162, 171 (Pa. Super. 2010) (citations and quotation marks omitted).

Here, at sentencing, the trial court heard testimony from Appellant, Appellant's family, and the complainant. *See* N.T. Sentencing Hr'g, 8/13/18, at 5-39. The trial court also noted that it possessed a PSI report, which it "very carefully reviewed" prior to the hearing. *Id.* at 40. Therefore, the record demonstrates that the trial court was aware of relevant information regarding Appellant's character and considered those factors in fashioning Appellant's sentence. *See Moury*, 992 A.2d at 171. Under these circumstances, Appellant has failed to establish that the trial court ignored or misapplied the law, and we discern no abuse of discretion. *See Raven*, 97 A.3d at 1253. Therefore, Appellant is not entitled to relief on this claim.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/27/19

- 19 -